**FIDELITY NATIONAL TITLE COMPANY, f/k/a Security Title Guaranty Company, Defendant–Appellant,**

v.

**FIRST AMERICAN TITLE INSURANCE COMPANY, Third–Party Defendant–Appellee.**

**Court of Appeals No. 12CA0722**

Colorado Court of Appeals, Div. V.

Announced May 23, 2013

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2012.

Wells Anderson & Race, LLC, Mary A. Wells, L. Michael Brooks, Jr., Denver, Colorado, for Defendant–Appellant.

Montgomery Little & Soran, P.C., Frederick B. Skillern, Echo D. Ryan, Greenwood Village, Colorado, for Third–Party Defendant–Appellee.

Opinion by Judge TERRY

¶ 1 This action involves title insurance and the contractual duties of a real estate closer. Defendant, Fidelity National Title Company, formerly known as Security Title Guaranty Company (Agent), appeals the trial court's judgment in favor of third-party defendant, First American Title Insurance Company (Underwriter). We affirm.

¶ 2 As issues of first impression, we
- construe the meaning of "handling funds in connection with any escrow" in the parties' contract;
- construe the meaning of the phrase "payoff statement" in section 38–35–124.5, C.R.S. 2012; and
- construe the meaning of the phrase "actual prejudice" in the parties' contract.

## I. Background

¶ 3 During the period pertinent to this action, Agent, a title insurance agent, issued

title insurance policies that were underwritten by Underwriter pursuant to an underwriting agreement (the contract). Under the contract, Agent was to perform title services and closing services. The contract also contained several provisions apportioning liability between Underwriter and Agent in the event of a claim by an insured.

¶ 4 This lawsuit arose from a series of events toward the end of 2007, when Agent wrote two title insurance commitments underwritten by Underwriter, each of which committed to insure a different bank as the first position lienholder for the same parcels of real estate. The title insurance policies based on these commitments were ultimately issued in 2008.

¶ 5 The first title commitment was issued with respect to Brown Financial, LLC (Brown), which loaned money to the developer of the parcels (Developer). Brown assigned its deed of trust to Academy Bank (Academy), and Brown serviced the loan by collecting money from Developer and forwarding it to Academy. The policy based on this commitment ultimately insured Academy as the first position lienholder.

¶ 6 Two months after Agent had issued the commitment for the Brown title policy, Agent issued a title commitment to insure the interest of Colorado East Bank & Trust (CEB&T) as first position lienholder on the same parcels, in connection with a new loan from CEB&T to Developer. In preparation for issuance of this new title commitment, Agent performed a title search, which indicated that Agent had recently performed a previous title search on the same property in connection with the earlier Brown transaction. The CEB&T title commitment stated a requirement that the previous deed of trust be released, and noted that the deed of trust had been assigned to Academy.

¶ 7 Agent conducted the closings of both loans within a two-month period. Agent failed to pay Academy from the closing proceeds of the CEB&T loan, and failed to obtain a release of Academy's deed of trust on the parcels.

¶ 8 When the title policies were issued in 2008, both Academy and CEB&T were in-

sured as first position lienholders for the same parcels. Agent did not notify Underwriter of this fact.

¶ 9 After Academy began foreclosure proceedings on the parcels in 2009, CEB&T sought to enjoin the foreclosure. Because the Academy lien had not been paid or released, Academy asserted a claim against Underwriter under the Brown title policy, and CEB&T asserted a claim against Underwriter under CEB&T's title policy. Underwriter paid CEB&T $986,000 to resolve the latter's claims in the foreclosure, and $55,000 to reimburse CEB&T for its attorney fees.

¶ 10 The claims at issue in this appeal are by Underwriter against Agent under the terms of the contract. After a bench trial, the trial court issued a thorough and well-reasoned opinion finding in favor of Underwriter. This appeal follows.

## II. Discussion

¶ 11 Agent contends that the trial court erred by misinterpreting sections 7.2, 7.3, and 7.4 of the contract. According to Agent, under those provisions, it has no liability to Underwriter, or, if it is liable, its liability is contractually limited to $500. We discern no reversible error.

## A. Standard of Review

¶ 12 We interpret contractual terms de novo. *Mountain States Mut. Cas. Co. v. Roinestad*, 2013 CO 14, ¶ 13, 296 P.3d 1020. "Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo.2000). We also determine de novo whether a contract's terms are ambiguous. *Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 950 (Colo.App. 2011). However, "[t]he parties' disagreement over the meaning does not in and of itself create an ambiguity in the contract." *Id.* (citing *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo.1990)).

¶ 13 To the extent that Agent challenges the trial court's factual findings, we review those findings for clear error. *See Saturn*

*Sys., Inc. v. Militare,* 252 P.3d 516, 521 (Colo.App.2011). Because the credibility of the witnesses and the sufficiency, probative effect, and weight of all the evidence, as well as the inferences and conclusions to be drawn therefrom, are all within the province of the trial court, we will not disturb the court's findings of fact unless they are so clearly erroneous as to find no support in the record. *Id.*

### B. Analysis

#### 1. "Handling Funds" in Connection with "Escrow"

¶ 14 Agent first maintains that the trial court misconstrued section 7.3 of the contract and erroneously found Agent liable for committing "[an] error, fault, or negligence in handling funds in connection with [an] escrow." We disagree.

¶ 15 We begin our analysis by examining more closely the title commitment requirements prepared by Agent's title department. Agent's loan closer, Shirley Seib, testified that the title commitment requirements are the "bible" that specifies all of the "particular items that need to be ... met before" the closer can disburse funds at closing.

¶ 16 Here, Requirement G. of the title commitment required that the deed of trust on the property be released. It showed that the original beneficiary of the deed of trust was Brown, but that the deed of trust had been assigned to Academy. Thus, it indicated that *Academy* would need to release the deed of trust.

¶ 17 As Agent was preparing for the closing, it received a letter from Brown. The letter stated that Brown was not owed any funds from the closing, and that Brown would provide a release of deed of trust and the original promissory note, marked "paid in full," "within fourteen days of the closing." The letter made no mention of Academy, and gave no indication that Academy would release the deed of trust at or before the closing. This omission raised the distinct possibility that, if the letter were relied on, Agent might proceed to closing and disburse funds at closing *before* the Academy deed of trust was released, thus failing to fulfill Re-

quirement G. (As we now know in hindsight, this possibility became reality.)

¶ 18 Seib, who was in charge of the file with respect to closing the CEB&T loan, testified that she was "not happy" with the Brown letter, because it made no mention of Academy. She took the letter to Agent's Branch Manager, Greg Wolff, who approved the transaction to proceed to closing.

¶ 19 Section 7.3 of the contract makes Agent liable to Underwriter "for any loss or damage suffered by [Underwriter] arising from any error, fault, or negligence by Agent in handling funds in connection with any escrow whether or not such loss or damage is covered by any policy of title insurance issued through or in connection with such escrow." The trial court found that Agent negligently handled funds in connection with an escrow, in violation of section 7.3.

¶ 20 Agent contends that the trial court misinterpreted the contract in two ways: (1) it essentially wrote the term "handling funds" out of the contract, and (2) it erroneously equated escrow services with closing services. On the first point, Agent argues that its conduct involved performing a title search and completing a closing in reliance on the Brown letter, and that any error in the performance of these tasks did not arise from "handling funds." On the second point, Agent argues that any errors occurred in the context of a real estate closing, and that its closing services do not fall within the meaning of "escrow" as used in section 7.3.

¶ 21 We conclude that the trial court's findings on these issues are supported by the record and by the plain meaning of the terms of the contract.

¶ 22 To "handle" means "to deal with; act upon; dispose of; *perform some function with regard to." Webster's Third New International Dictionary Unabridged* 1027 (2002) (emphasis added).

¶ 23 Agent proceeded with the closing and disbursed funds to Developer in reliance on the Brown letter. The record reflects that Agent had no basis to rely on the letter because, as the trial court found, Agent "clearly knew that [Brown] did not have au-

thority to release a promissory note or deed of trust without [Academy's] written consent." Nevertheless, Agent's Branch Manager erroneously considered the Brown letter as sufficient to allow the transaction to close.

¶ 24 Because, under Requirement G., obtaining the release of the Brown–Academy deed of trust was a necessary prerequisite to disbursing funds at the CEB&T loan closing, Agent's error in relying on the Brown letter caused it to disburse more than $1 million to Developer that it should not have disbursed. Thus, Agent's error was in "perform[ing] some function with regard to" the funds it disbursed, and constituted an error in "handling" funds.

■ ¶ 25 We further conclude that Agent's error in handling funds occurred "in connection with [an] escrow." An escrow

involves the deposit, by one person or more often by two or more persons having divergent interests, of documents or money, or both, with a third person known as an escrow holder or escrow agent, pending the performance of certain specified conditions or the happening of some specified event, upon which delivery of the documents or money is to be made to the parties entitled thereto under the terms of the escrow agreement.

2 Colorado Methods of Practice § 67:1 (6th ed. 2013).

¶ 26 "Escrow services typically include accepting funds and documents from the parties to the transaction and holding them for delivery to the proper parties when stated conditions have occurred." Joyce D. Palomar, *Title Insurance Law* § 20:2, at 315 (2011–2012 ed.).

¶ 27 Agent's president testified, and equated "escrow services" with closing services:

A: [Agent's] Colorado operation [entails] escrow[,] sales[,] and title.

Q: .... So you would view the title agency business as being divided into, essentially, those three components, escrow, sales, and closing—excuse me, closing, sales, and title?

A: Principally, yes.... The title functions are such that we have ... depart-

ments that deal solely with title, in the sense of preparing title reports, property reports that lay out the status of a piece of property at any given time, and then also the preparation of the final issuance of title policies. *On the escrow side, it is the part of helping put together the settlement and closing process.*

(Emphasis added.)

¶ 28 Our conclusion is further bolstered by the testimony of Underwriter's witness, Robert Edwards, who testified as an expert in title industry standards, as well as in closing and settlement services. He said, "[W]hen I say 'closing' or 'escrow,' to my way of thinking, [they are] the same thing. [They are just] different term[s] for the same process." According to Edwards, the following errors and omissions of Agent were made in connection with an escrow:

- Failure to contact Academy to get a payoff statement, or, alternatively, to require Brown to bring to closing the original, cancelled note and a signed release of deed of trust.

- Failure to accomplish payoff of the indebtedness to Academy to obtain a release of the deed of trust.

- Improper preparation of the HUD–1 settlement statement showing who was to be paid and in what amounts from the CEB&T loan proceeds. The settlement statement should have shown the amount of funds owed to Academy.

- Improper disbursal of funds to Developer—who was not entitled to the funds—instead of to Academy.

- Improper accounting to Academy.

¶ 29 If more proof were needed, the record contains a stipulated exhibit, titled "ESCROW RECEIPT" and printed on Agent's letterhead, that reflects the receipt of $1,768,164 from CEB&T "for the account of" Developer. We understand this document to mean that Agent acted as an escrow holder or escrow agent with regard to CEB&T's funds, which were later disbursed to Developer.

¶ 30 We therefore conclude that Agent's error occurred in the context of "handling

funds in connection with [an] escrow," and fell within the provisions of section 7.3 of the contract.

### 2. Section 38–35–124.5 Defense

¶ 31 Agent maintains that, under section 38–35–124.5, the letter it received from Brown was a "payoff statement" on which Agent was entitled to rely, and therefore it is not liable to Underwriter for any error. We conclude that the letter was not a "payoff statement" within the meaning of the statute, and that the statute provides no basis on which Agent could have reasonably relied on the letter.

¶ 32 As pertinent here, section 38–35–124.5 states:

(1) Any person or entity providing closing and settlement services for a real estate transaction and to whom a payoff statement is addressed *shall be entitled to reasonably rely on the amounts that are set forth in such payoff statement* for the time frame set forth therein and *shall not be liable to the creditor or holder of the indebtedness or its agent for any omitted amounts* . . . .

. . . .

(3) Notwithstanding the provisions of this section, in the event of an error in the written *payoff statement provided by a creditor or holder of the indebtedness or its agent,* the creditor shall retain any remedies . . . to collect directly against the obligor any unsecured additional amounts determined to be outstanding.

(Emphasis added.)

¶ 33 Brown's letter to Agent stated: "Our company[, i.e., Brown,] is not due any monies at this closing. We will forward to your company the release, original promissory note marked 'paid in full' and the deed of trust within 14 days of your closing." This letter did not meet the statutory requirements for a payoff statement.

¶ 34 Expert witness Edwards testified to custom in the industry that a "payoff statement" ordinarily would be a statement that a certain sum of money would need to be paid at closing in exchange for release of a deed of trust. He testified, "[I]n that respect,

[Brown's letter] was not a payoff [statement;] it was just a statement by [Brown] that no money was due to [Brown]. It didn't say how much money was due to [Academy, which was] the holder of the indebtedness and the holder of that loan, according to the title commitment."

¶ 35 We read section 38–35–124.5(3) as defining the classes of persons who may issue a payoff statement that may be relied upon as described in subsection (1). To create such protected reliance, a payoff statement must be "provided by a creditor or holder of the indebtedness or its agent." § 38–35–124.5(1), (3). "The indebtedness" in question here was the debt owed to Academy, which was shown of record as the holder of the deed of trust on the property. Agent argues that Brown was a servicer of the loan issued by Academy, and was thus acting as agent for Academy in issuing the letter. Even assuming, for purposes of argument, that Brown was Academy's agent, and given that the letter gave no information about the indebtedness to Academy, we conclude the letter cannot qualify as a payoff statement with respect to the debt owed to Academy.

¶ 36 To the extent the letter indicated that no funds were owed to Brown, that statement was true as far as it went, but it provided no basis for Agent to conclude that there were no funds owed to Academy. Indeed, Seib, who was preparing the matter for closing, testified that she would not authorize disbursement of funds at closing of the CEB&T loan based on that letter because it was from the original lender (Brown) and not from the assignee of the collateral (Academy). Becky Plack, who worked in Agent's title department, testified that a payoff letter would be acceptable at closing in lieu of a release of deed of trust only if the letter came from the party who had the right to release the note and deed of trust. Nevertheless, Agent's Branch Manager Greg Wolff approved Brown's letter in satisfaction of Requirement G. of the title commitment that the Academy deed of trust be released.

¶ 37 Under the facts presented here, Agent could not have reasonably relied on the Brown letter to conclude that no funds were

owed to Academy at closing, and the statute does not provide a defense to Agent.

### 3. Notice Requirement Under Section 7.4

¶ 38 Agent next argues that the trial court misconstrued the language of section 7.4 by ruling that (1) Agent had knowledge of a claim or loss stemming from a title report, and (2) Agent's failure to give notice of such a claim or loss caused Underwriter to sustain "actual prejudice." We disagree.

¶ 39 Section 7.4 requires both parties to promptly notify each other in writing of any claim or loss under any title report issued hereunder and of any facts or circumstances known to it and which may reasonably result in the assertion of a claim of loss under any title report, or of the commencement of any litigation in which a claim of loss is asserted. Failure to give such notice in a timely manner shall not affect the rights of the parties under this contract unless such failure results in actual prejudice to the rights of the other party.

#### a. Agent's Knowledge

¶ 40 Agent contends that it could not have known of facts or circumstances that would result in the assertion of a claim or the commencement of litigation if that knowledge was the sum of things known to different employees, in different offices, at different times. We reject this contention. Agent must be held accountable for the knowledge of its employees, and particularly of its Branch Manager, because, as a matter of law, "notice coming to an officer or agent of a corporation within the scope of his duties is notice to the corporation." *Bock v. Am. Growth Fund Sponsors, Inc.*, 904 P.2d 1381, 1384 (Colo.App.1995); *see also Bergeson v. Life Ins. Corp.*, 265 F.2d 227, 232 (10th Cir. 1959) ("A corporation necessarily acts vicariously. It is elementary that a corporation can acquire knowledge only through its officers and agents. Their knowledge is the knowledge of the corporation." (footnote omitted)) (applying Utah law).

¶ 41 As the trial court found, and as the record reflects, Agent's Branch Manager served as the marketing representative for both Developer's loan transaction with Brown (a transaction which resulted in the deed of trust to Academy), and Developer's loan transaction with CEB&T; approved the Brown letter; and authorized the CEB&T loan transaction to proceed to closing. As a result of those facts, combined with the fact that Agent knew of the recording of the assignment to Academy of the Brown deed of trust, the trial court found that Agent had "actual knowledge that it was insuring two different entities as first priority lien holders with respect to the same [parcels] of property." Therefore, Agent had a duty to provide notice to Underwriter under section 7.4 of the contract. *Cf. Morgan v. Bd. of Water Works*, 837 P.2d 300, 303 (Colo.App.1992) ("[A]lthough an entity's employees may have been ignorant of the presence of a particular obstruction, if in the exercise of ordinary diligence they should have known of it, they will be deemed to have had notice.").

#### b. "Actual Prejudice"

¶ 42 We next consider the meaning of the contractual term addressing "actual prejudice" to the party who is to receive notice. Though the phrase "actual prejudice" has not previously been construed in a Colorado appellate opinion, it is easily understood. We construe it in this context to mean substantial detriment to the significant interests of the party to whom notice is to be given. *See Black's Law Dictionary* 1299 (9th ed. 2009) (defining "prejudice" as "[d]amage or detriment to one's legal rights or claims"); *see also Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 643–44 (Colo.2005) (discussing prejudice in context of failure to give notice to insurer as prejudice to "significant interests," such as opportunity to investigate or defend an insured's claim, gather information, negotiate settlement, and secure evidence); *Worthey v. Sedillo Title Guar., Inc.*, 85 N.M. 339, 512 P.2d 667, 670 (1973) (considering whether there was "actual prejudice" to a title company, and indicating that "the prejudice with which we are here concerned is prejudice measured in terms of money, since the Title Company's obligation under its policy was expressed in terms of dollars").

¶ 43 This construction is consistent with federal cases construing the meaning of "actual prejudice" in the context of habeas corpus review. *See, e.g., Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir.2008) (to show "actual prejudice," a petitioner must establish that errors at his trial worked to his actual and substantial disadvantage); *Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir.2007) ("actual prejudice" is demonstrated if the error in question had a "substantial and injurious effect or influence" in determining a jury's verdict).

■ ¶ 44 The record reflects that Underwriter suffered actual prejudice to its rights as a result of Agent's failure to notify it of the conflict inherent in Agent's having issued title insurance policies to two different entities in the first priority lien position on the same property. More than two years passed between the date when Agent improperly disbursed funds to Developer and the date when Underwriter received notice of a claim from CEB&T. Trial testimony showed that, had Underwriter known about the conflict before Developer's default and the subsequent litigation, Underwriter could have tried to negotiate with one of the parties to obtain a full and complete release of the deed of trust, required arbitration, or sought amendments to the policies. Had timely notice been given, according to Underwriter's claims counsel, there still would have been equity in the property, and "the parties would have been able to resolve this in a way that would not have required [Underwriter's issuance of] a $986,000 check." Because Underwriter was not made aware of the situation and did not have this opportunity, it appointed counsel for one of its insureds—CEB&T—to sue Academy, which was another insured for the same property. This is clearly an undesirable position for an insurer. Worse yet, Underwriter was made a party to the litigation, and had to pay $986,000 to resolve CEB&T's claims in the foreclosure, and $55,000 to reimburse CEB&T for its attorney fees.

¶ 45 We conclude that the record supports the trial court's ruling that Agent breached section 7.4 of the contract by failing to notify Underwriter of facts or circumstances known to Agent that could result in a claim or in litigation, and that this failure resulted in actual prejudice to Underwriter's rights.

### 4. Limitation of Liability

■ ¶ 46 Finally, Agent argues that its liability, if any, is limited to $500 under Section 7.2 of the contract. Although Agent admits that it did not raise the applicability of the $500 liability limit at trial, it claims to have preserved this argument by raising it in the trial management order and in its C.R.C.P. 59(a)(4) motion to amend the judgment. We conclude that the issue was not preserved for our review.

¶ 47 Section 7.2 of the contract provides:

[Agent] shall reimburse [Underwriter] up to a maximum amount of Five Hundred Dollars ($500.00) but in no event to exceed Five Hundred Dollars ($500.00) on any Single Loss as defined herein actually paid to any or all of the insureds under any single policy of title insurance regardless of the cause of said loss.

¶ 48 In the trial management order, Agent stated:

[Agent] denies [Underwriter's] breach-of-contract claim against it. The parties' Underwriting Agreement contains specific provisions governing the allocation of losses as between [U]nderwriter and [A]gent arising from claims made under title insurance policies. *Subject to specific exceptions enumerated in Section 7 of the Underwriting Agreement, [Agent]'s share of losses is limited to $500 per claim.* The facts and circumstances underlying the claims in this case do not fall within any of the exceptions of Section 7 of the Underwriting Agreement....

[E]ven if it were to be determined that [Agent] "mishandled funds" [under section 7.3 of the contract], in connection with the ... transaction, its liability should nevertheless be limited to $295,184.38, representing the difference between the total amount paid to settle the two claims and the amount that was paid [out] with proceeds of the [CEB&T] loan.

(Emphasis added.)

¶ 49 In its C.R.C.P. 59(a)(4) motion, Agent argued that the trial court did not consider

the $500 liability limit in Section 7.2, and thus erroneously awarded Underwriter more than $500 in damages based on breach of sections 7.3 and 7.4 of the contract.

¶ 50 Agent's statement of position in the trial management order did not alert the court to its argument that any damage award would necessarily be limited to $500. On the contrary, it indicated Agent's belief that, if any of the "specific exceptions enumerated in Section 7" applied, the $500 limit would not be applicable, and the damages for breach of section 7.3, for example, could amount to $295,184.

■ ¶ 51 Thus, the argument raised in the trial management order was not the same as the argument raised in the C.R.C.P. 59(a)(4) post-trial motion, and was not sufficient to preserve the argument for appeal. Where, as here, a defense is raised for the first time in a post-trial motion, it is not preserved for appellate review. *See Miller v. Rowtech, LLC*, 3 P.3d 492, 495 (Colo.App.2000); *Levy–Wegrzyn v. Ediger*, 899 P.2d 230, 232 (Colo. App.1994); *cf. Blood v. Qwest Serv. Corp.*, 224 P.3d 301, 328 (Colo.App.2009) (when a defense is raised in a pleading and later presented in a post-trial motion, but not raised during trial, it is not preserved for appellate review), *aff'd*, 252 P.3d 1071 (Colo. 2011).

¶ 52 Because Agent did not raise, until its post-trial motion, the argument it now makes that section 7.2 limits its liability to $500, we conclude that this issue was not preserved for appeal.

¶ 53 Judgment affirmed.

Judge STERNBERG * and Judge ROY* concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and