The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 2, 2026

**2026COA23**

**No. 23CA2048, *In re Marriage of Luttkus* — Family Law — Dissolution — Permanent Orders — Spousal Maintenance — Child Support: Health and Welfare — Services for Persons with Intellectual and Developmental Disabilities — Home and Community-Based Servies Waiver for Persons with Developmental Disabilities**

In this dissolution of marriage case, the trial court entered permanent orders that divided the marital estate, awarded maintenance to wife, and ordered child support to wife concerning the parties' adult disabled daughter. In determining maintenance and child support, the court included in wife's income money paid to her through the Home and Community-Based Services Waiver for Persons with Developmental Disabilities (HCBS-DD waiver) program — a program related to providing care for the parties' disabled daughter.

On appeal, as an issue of first impression, a division of the court of appeals concludes that the court erred by including the HCBS-DD waiver payments in wife's income. Based on this conclusion, the division reverses the portion of the trial court's permanent orders concerning maintenance and child support and remands the case to the trial court for further proceedings.

Court of Appeals No. 23CA2048
Douglas County District Court No. 22DR30689
Honorable Donna Stewart, Judge

In re the Marriage of

Vicki Krieger,

Appellant,

and

Jeffrey Luttkus,

Appellee.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

Announced April 2, 2026

Paige Mackey Murray, LLC, Paige Mackey Murray, Boulder, Colorado, for
Appellant

Wright Family Law, Jamie L. Wright, Centennial, Colorado, for Appellee

¶ 1     The district court magistrate, whom we will refer to as the trial court, dissolved the marriage of Vicki Krieger (wife) and Jeffrey Luttkus (husband). The trial court entered permanent orders that divided the marital estate, awarded maintenance to wife, and ordered child support to wife concerning the parties' adult disabled daughter. In determining maintenance and child support, the court included in wife's income money paid to her through the Home and Community-Based Services Waiver for Persons with Developmental Disabilities (HCBS-DD waiver) program — a program related to providing care for the parties' disabled daughter.

¶ 2     On appeal, wife contends that the court erred by (1) using the wrong method for allocating husband's defined benefit pension plan; (2) including in its determination of her income the money she received from the HCBS-DD waiver; and (3) ordering a term of maintenance that automatically terminated when husband retired from his present employment. We affirm the court's property division. But as an issue of first impression, we conclude that the court erred by including the HCBS-DD waiver payments in wife's income. We therefore reverse the portion of the trial court's permanent orders concerning maintenance and child support. As a

1

result, we need not address wife's dispute regarding the maintenance term. The case is remanded to the trial court for further proceedings.

## I.     Background

¶ 3     The parties were married in 1992 and have three daughters. The oldest and youngest daughters have disabilities and, from a young age, have required significant daily assistance, which wife has primarily provided.[1]  Wife, who was fifty-seven years old at the time of the permanent orders hearing, hasn't been employed outside the home since 1999.

¶ 4     L.L., the youngest daughter, was diagnosed with an auditory processing disorder, generalized anxiety disorder, bipolar disorder, and an autism spectrum disorder.  When she was younger, L.L. would have violent outbursts that were at times so severe wife was forced to call the police or take L.L. to a hospital.

¶ 5     At the time of the permanent orders hearing, L.L. was eighteen, lived primarily with wife, and spent one night a week with

---

[1] At the time of the permanent orders hearing, the oldest daughter did not live with the parties, and neither party raises an issue on appeal relevant to their oldest daughter.

2

husband. Wife reported that L.L. no longer experienced violent episodes, but she still had frequent panic attacks and verbal outbursts, which could occur unexpectedly. Wife explained that L.L. required daily care and that wife was responsible for L.L.'s care. Wife further described being responsible for transporting L.L. to and from a weekly equine therapy session; facilitating in-home behavioral therapy sessions for L.L. two or three times a week; and keeping daily logs of L.L.'s activities, medications, sleep habits, behavioral outbursts, and health concerns.

¶ 6 In 2015, wife enrolled L.L. in the Children's Extensive Support Waiver — a joint state and federal Medicaid program providing home- and community-based benefits and services for L.L. based on her disability. After L.L. turned eighteen, she transitioned from the Children's Extensive Support Waiver to the HCBS-DD waiver, which allowed her to continue to receive benefits and services and remain at home under her family's care. From the HCBS-DD waiver, wife received approximately $5,000 per month. These payments were referred to as "difficulty of care payments" and were distributed to wife through a private company. The parties agree that L.L. is

3

disabled for the purposes of child support and will need support beyond the age of eighteen. *See* § 14-10-115(13)(a)(II), C.R.S. 2025.

¶ 7 Throughout the marriage, husband, who was sixty-six years old at the time of the permanent orders, worked at Lockheed Martin. His salary was significant and had increased steadily over the years. From his employment, he received a defined benefit pension plan and had generated a 401(k) worth nearly $2 million. Husband testified that he wanted to retire when his oldest daughter turned twenty-six, which was two years after the permanent orders hearing.[2]

¶ 8 With respect to maintenance and child support, wife argued that the court shouldn't include the difficulty of care payments in her income. She asserted that these benefits from a means-tested public assistance program were not income and further explained that the IRS didn't tax difficulty of care payments for live-in caretakers such as herself. However, husband argued that wife was "employed" as L.L.'s caretaker and that the difficulty of care

---

[2] Husband began working for Lockheed Martin in September 1980, the parties were married in August 1992, and their marriage was dissolved in October 2023.

payments were "paychecks" from the waiver program to compensate her as L.L.'s caregiver. He further argued that the "benefit" of the waiver program was the care that L.L. received (not the funds paid to wife), and that the difficulty of care payments would be paid to any caregiver for L.L. — whether the caregiver was a member of L.L.'s family or not. Given that, he contended that the difficulty of care payments should be included in wife's income for purposes of maintenance and child support.

¶ 9    After the October 2023 hearing, the trial court issued permanent orders and dissolved the marriage. The court divided the marital estate relatively equally. With respect to husband's pension, the court denied wife's request to use the net present value method to immediately distribute the value of the pension. The court instead used the deferred distribution method, ordering that, upon husband's retirement, the benefit will be proportionally allocated by applying the time rule formula.

¶ 10    With respect to the maintenance and child support, the trial court found that the difficulty of care payments were income to wife, ruling as follows:

[Wife] receives a difficulty of care payment in the amount of $5,000 per month for caring for [L.L.]  [Wife] argues that because it is not taxable, it should not be included as income. The [c]ourt is not persuaded.  [Section] 14-10-115(5)(a)(II) sets forth funds that are excluded as income for the purposes of child support calculations.  Difficulty of care payments paid out by a private entity are not listed as an exclusion.  As such, the [c]ourt finds that [wife]'s monthly income is $5,000 per month.

¶ 11    The court then found that husband's gross monthly income was $19,069.  It ordered husband to pay wife $3,702.40 per month in spousal maintenance, and it directed that this obligation "shall terminate upon [h]usband's retirement from his current position with Lockheed Martin."  The court explained that husband was "nearing retirement," and upon his retirement, "both parties will be receiving a portion of his pension."

¶ 12    Wife appeals the court's permanent orders.[3]

_____

[3] A district court magistrate entered the permanent orders with the parties' consent.  So, pursuant to the rules applicable at the time, direct appeal to this court was the required path for seeking appellate review.  *See* C.R.M. 7(b) (2025).  After the magistrate entered judgment in this case, the Colorado Rules for Magistrates were amended and those amendments apply to orders or judgments issued by magistrates on or after January 2, 2026.  *See* C.R.M. 7(d), (g) (2026).

## II. Issues on Appeal

¶ 13 Wife advances three interrelated issues on appeal. First, she contends that the trial court erred by using the deferred distribution method to allocate husband's pension. Second, she argues that the court incorrectly included in her income the difficulty of care payments for purposes of determining maintenance and child support. Third, she contends that the court erred when it ordered husband's maintenance obligation to terminate when he retired. We disagree with wife's first argument regarding the pension but agree with her second concerning the inclusion of the difficulty of care payments in her income. Given our conclusion, the portion of the permanent orders concerning maintenance and child support must be reversed and reconsidered by the trial court. As a result, we decline to review her last argument, which is unlikely to arise in the same posture on remand.

### A. Husband's Pension

¶ 14 Wife argues that the trial court erred by using the deferred distribution method to allocate the marital portion of husband's defined benefit pension plan. She contends that the court should have instead used the net present value method and immediately

allocated the value of the pension in its division of the marital estate to better protect her future financial interests. We aren't persuaded that the court abused its discretion.

### 1. Standard of Review

¶ 15    The trial court has great latitude in making an equitable division of the marital property based on the facts and circumstances of the case. *In re Marriage of Smith*, 2024 COA 95, ¶ 64. To achieve an equitable division, the court must consider all relevant factors, including each party's contribution, financially and as a homemaker, to the acquisition of marital property; the value of property set apart to each party; each party's economic circumstances; and any change to the value of each party's separate property during the marriage. § 14-10-113(1)(a)-(d), C.R.S. 2025; *Smith*, ¶ 64.

¶ 16    We won't disturb the court's allocation of marital property without a showing that the court abused its discretion. *Smith*, ¶ 65. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misapplication of the law. *Id.*

## 2.    Allocation

¶ 17    When dividing the marital estate, there are three methods that a court may use to allocate a party's pension: (1) net present value; (2) deferred distribution; and (3) reserve jurisdiction. *In re Marriage of Kelm*, 912 P.2d 545, 547 (Colo. 1996); *In re Marriage of Hunt*, 909 P.2d 525, 530-31 (Colo. 1995).

¶ 18    Under the net present value method, the court distributes the present marital value of the pension at the time of dissolution. *Kelm*, 912 P.2d at 547; *Hunt*, 909 P.2d at 531.  To do so, the court offsets the pension's value with the value of other marital property. *Kelm*, 912 P.2d at 547; *Hunt*, 909 P.2d at 531.

¶ 19    Under the deferred distribution and reserve jurisdiction methods, the court delays distribution of the pension until the pension benefits are distributed.  *Kelm*, 912 P.2d at 547; *Hunt*, 909 P.2d at 531.  With the deferred distribution method, the court applies the "time rule" formula to predetermine the percentage of the pension benefits the parties will receive from the allocation of

9

the marital asset.[4]  *Kelm,* 912 P.2d at 547; *Hunt,* 909 P.2d at 531.
With the reserve jurisdiction method, the trial court waits and
determines an equitable allocation of the pension when the benefits
begin to be paid.  *Kelm,* 912 P.2d at 547-48; *Hunt,* 909 P.2d at 531.

¶ 20      As noted, the parties presented competing requests concerning
the allocation of husband's pension.  Wife asked the court to use
the net present value method and immediately value and distribute
the pension.  She asserted that the present value of the pension
was $1,140,000, and she asked the court to allocate this future
benefit to husband, offsetting that value by allocating her additional
equity from the marital estate.  Husband asked the court to use the
deferred distribution method, delaying the distribution of the
pension's marital equity.  He explained that using the net present
value method was inequitable because it would give wife virtually all

---

[4] The time rule formula incorporates a "coverture fraction," which
consists of a numerator — the length of time (in months or years) of
creditable service towards the pension accumulated during the
marriage — over the denominator — the length of time (in months
or years) of total service towards the pension.  The coverture
fraction is then multiplied by the monthly pension benefit and
divided in half, representing an equal division of the pension
benefits attributable to the marriage.  *In re Marriage of Hunt,* 909
P.2d 525, 531-32 (Colo. 1995).

the liquid marital assets and husband might never receive the full value of his future pension benefits.

¶ 21    After considering their competing requests and balancing the relevant circumstances, the trial court adopted husband's request. Finding that wife's proposed net present value was "subject to too many variables and based on a presumption of [h]usband's life expectancy," it determined that the deferred distribution method was the most equitable way to allocate the pension.

¶ 22    While wife disagrees with the court's decision, she acknowledges that applying a present value to husband's defined benefit pension involves "various assumptions regarding mortality and the amount of retirement pay to which [husband] will be entitled." Indeed, "[n]ormally, the valuation of future retirement payments is the subject for expert testimony, usually from an actuary." *In re Marriage of Zappanti*, 80 P.3d 889, 892 (Colo. App. 2003). This is so because determining the present value of a pension entails applying a series of actuarial and investment assumptions relating to a party's life expectancy and probable retirement age to the benefit. *Kelm*, 912 P.2d at 551. Wife presented no expert testimony in support of her purported net

11

present value, and the court found, with record support, that wife's value was too uncertain under the circumstances.

¶ 23    Moreover, "[t]he net present value method is used most often when the value of the pension is low" relative to the marital estate, and the party had "worked relatively few qualifying years during the marriage or the [party] earned a relatively low rate of pay." *Hunt,* 909 P.2d at 531, 539. But that wasn't the case here. During the marriage, husband accumulated over thirty years of service towards his pension, and the value of the pension (as presented by wife) was significant, particularly when compared to the remaining value of the marital estate, which was approximately $2,600,000.

¶ 24    The court exercised its discretion to choose a distribution method that best suited the needs and financial circumstances of the parties. *See id.* at 540; *Smith,* ¶ 65. In doing so, the court appeared to prioritize accuracy — and therefore fairness — by avoiding potentially flawed assumptions. Beyond her disagreement, wife doesn't point to anything in the record that shows the court's use of the deferred distribution method was arbitrary, capricious, or contrary to the law. *See Smith,* ¶ 65. We therefore won't disturb its choice. *See Hunt,* 909 P.2d at 538 ("[A]n appellate court must not

disturb the delicate balance achieved by the trial court in division of property. The trial court is best-situated to render the distribution in the first instance, and its decision should not be disturbed on appeal unless there has been a clear abuse of discretion.").

### 3. Survivor Benefit

¶ 25 At the permanent orders hearing, husband agreed to purchase the full survivor benefit on his pension to benefit wife. The trial court, however, didn't include this commitment in its final orders. At oral argument, husband's counsel stipulated that, on remand, the court should include in its final orders his commitment to secure a full survivor benefit on his pension for wife. We accept this stipulation. Accordingly, on remand the trial court shall amend the permanent orders to include this obligation.

### B. Difficulty of Care Payments

¶ 26 Wife next argues that the trial court erred by including the difficulty of care payments in its determination of her income for the purposes of calculating spousal maintenance and child support. We agree.

## 1.  Preservation

¶ 27    Husband, relying on *Fidelity National Title Co. v. First American Title Insurance Co.*, 2013 COA 80, ¶¶ 46-52, contends that wife didn't preserve the argument she advances on appeal.  He argues that, at the hearing, wife's argument was restricted to excluding the difficulty of care payments from her income because they were benefits from a means-tested public assistance program, *see* § 14-10-114(8)(c)(II)(B), C.R.S. 2025; § 14-10-115(5)(a)(II)(B), not the broader argument she now advances on appeal.  We disagree with husband.

¶ 28    A party doesn't need to use talismanic language to preserve an issue.  *In re Marriage of Stradtmann*, 2021 COA 145, ¶ 9.  The party need only raise the issue for the court to rule on it.  *In re Marriage of Turilli*, 2021 COA 151, ¶ 12.

¶ 29    In *Fidelity*, a division of this court held that the plaintiff hadn't preserved an argument that it advanced on appeal because it made a *different* argument at trial.  *Fidelity*, ¶¶ 50-51.  But here, wife makes largely the same argument as she did to the trial court — that the difficulty of care payments shouldn't be included in her income for purposes of determining maintenance and child support

14

because they are more akin to other nonincome payments and aren't taxed by the IRS. Wife has remained unwaveringly consistent that the difficulty of care payments shouldn't be treated as income for purposes of maintenance and child support and the trial court ruled on that issue. This is therefore unlike the situation in *Fidelity*.

¶ 30 Accordingly, we conclude that wife sufficiently preserved for appellate review her challenge to the trial court's inclusion of the difficulty of care payments in her income.

## 2. Standard of Review

¶ 31 We review a trial court's maintenance and child support rulings for an abuse of discretion. *In re Marriage of Tooker*, 2019 COA 83, ¶ 12.

¶ 32 The court's determination of a party's income presents a mixed question of fact and law. *In re Marriage of Garrett*, 2018 COA 154, ¶ 9. We defer to the court's factual findings if they are supported by the record, but we review de novo its legal conclusions — such as whether difficulty of care payments should be classified as income. *See Tooker*, ¶ 12; *Garrett*, ¶ 9. "When interpreting a statute, we

15

adopt an interpretation that best effectuates the legislative purposes." *In re Marriage of Vittetoe*, 2016 COA 71, ¶ 4.

### 3. Analysis

¶ 33 The Colorado Medical Assistance Act (CMAA) implements a joint state and federal Medicaid program to promote the health and welfare of individuals and their families who don't have the resources to provide the necessary care for themselves. §§ 25.5-4-102, -104(1), C.R.S. 2025. The HCBS-DD waiver, a program established by the CMAA, provides home- and community-based services to individuals with intellectual and developmental disabilities who need the level of care available in an intermediate care facility. § 25.5-6-409(1)-(2), C.R.S. 2025. Through this waiver program, services are provided for the individual's "social, habilitative, remedial, residential, health, and other needs" to avoid placing the individual in an intermediate care facility. § 25.5-6-409(1).

¶ 34 This case presents a question that no Colorado appellate court has previously addressed — whether the difficulty of care payments provided by the HCBS-DD waiver are income for purposes of spousal maintenance and child support. We begin by examining

whether the difficulty of care payments qualify as compensation to wife, and we conclude that they don't. Next, we examine whether the difficulty of care payments, while not compensation, still fall under the broad definition of income when determining maintenance and child support. We again conclude that they don't.[5] Last, we reject husband's claim that the difficulty of care payments nonetheless should be considered as income for L.L., which could reduce his child support obligation.

a. The Difficulty of Care Payments Aren't Compensation

¶ 35 For purposes of determining maintenance and child support, gross income is statutorily defined in sections 14-10-114(8)(c)(I) and 14-10-115(5)(a)(I). These sections contain substantially similar, comprehensive lists of income sources that a court includes when calculating a party's income, including salaries, wages, and

---

[5] Wife also argues that we should consider the fact that the difficulty of care payments aren't taxed by the IRS, but that consideration is irrelevant to our analysis. *See In re Marriage of Nimmo,* 891 P.2d 1002, 1005-06 nn.5, 7 (Colo. 1995) (explaining that state and federal tax code definitions of income "are irrelevant to an interpretation of" gross income under section 14-10-115, C.R.S. 2025); *In re Marriage of Armstrong,* 831 P.2d 501, 503 (Colo. App. 1992) ("[A] source of income under the child support guidelines is not determined by other definitions which may be used for federal or state income tax purposes.").

payments received as an independent contractor.  § 14-10-114(8)(c)(I)(A), (B), (D); § 14-10-115(5)(a)(I)(A), (B), (D).

¶ 36    Husband contends that the difficulty of care payments wife receives under the HCBS-DD waiver aren't "benefits" of the program — means-tested or otherwise.[6]  Rather, he argues that the benefit is the care L.L. receives (whether from wife or anyone else).  He therefore contends that the difficulty of care payments compensate wife for working as L.L.'s caregiver, just as the payments would compensate any other third party caring for L.L., and that such compensation is included in wife's income.  For two reasons, we disagree.

¶ 37    First, nothing in the record shows that the difficulty of care payments cover the actual costs of L.L.'s caregiver needs.  Wife explained that L.L. needs twenty-four-hour care, can have panic attacks unexpectedly, and requires logistical support for her ongoing medical, educational, and psychological support programs.

---

[6] We acknowledge wife's argument that the HCBS-DD waiver is a means-tested program that, by statute, would be excluded from a party's income.  *See* § 14-10-114(8)(c)(II)(B), C.R.S. 2025; § 14-10-115(5)(a)(II)(B).  But given that we conclude the difficulty of care payments aren't income under an alternative rationale, we don't review or resolve this issue.

18

These needs, coupled with the program's prohibition on L.L. having more than $2,000 in her bank account, mean that wife will almost certainly be required to provide for nearly all of L.L.'s extensive needs out of pocket. *See* Dep't of Health Care Pol'y & Fin. Rule 8.7100.C.2, 10 Code Colo. Regs. 2505-10; *see also Reilly v. Marin Hous. Auth.*, 472 P.3d 472, 484 (Cal. 2020) ("At best, a parent's [difficulty of care payments] will offset a portion of the costs of keeping a developmentally disabled family member at home, and [they] would not go far in meeting the family's daily needs.").

¶ 38 Second, the difficulty of care payments don't adequately compensate wife for her work or even acknowledge the amount of work she provides caring for L.L. This is ably demonstrated by the ample evidence of L.L.'s extensive needs and wife's responsibilities under the waiver program. Moreover, to even qualify for the HCBS-DD waiver, L.L. must need "access to [twenty-four]-hour services and supports to meet [her] daily living needs." Dep't of Health Care Pol'y & Fin. Rule 8.7101.J.2.b, 10 Code Colo. Regs. 2505-10. Wife, therefore, is essentially on call for at least six days a week while L.L. is in her care. In addition, wife logs all of L.L.'s medications, activities, outbursts, and sleep habits; coordinates her

transportation to and from multiple programs each week; and participates in multiple therapy sessions with L.L. each week. *See Reilly*, 472 P.3d at 483 ("Unlike third party caregivers whose job it is to take care of someone on an hourly basis, for these parent providers, caring for their child 'is not a day job; it is their life.'" (citation omitted)). Husband's characterization of wife's role in L.L.'s care as fungible significantly undervalues her contribution as reflected in the record. And his assertion that L.L. "can do anything that a normal [eighteen]-year-old can do" is contradicted by the weight of evidence, including the fact that L.L. must require twenty-four-hour care to even qualify for the HCBS-DD waiver.

b.     The Difficulty of Care Payments Aren't Income to Wife

¶ 39     Having concluded that the difficulty of care payments aren't compensation to wife, we must next consider whether they nevertheless are included in the broad definition of income for purposes of maintenance and child support. We conclude that they aren't.

¶ 40     As wife argues, the policy goals of the HCBS-DD waiver are in line with payment programs such as adoption subsidies and foster care payments, which aren't included in a parent's income. *See,*

20

*e.g.*, *In re Marriage of Dunkle*, 194 P.3d 462, 465-66 (Colo. App. 2008); *In re Marriage of Bolding-Roberts*, 113 P.3d 1265, 1267-68 (Colo. App. 2005); *see also Reilly*, 472 P.3d at 486 (in holding that difficulty of care payments must be excluded from a party's income, the court noted that "[it couldn't] endorse a construction that yields a result antithetical to our nation's 'goal of providing families of children with disabilities with the support they need to raise their children at home'" (quoting 42 U.S.C. § 15091(c))).  In *Bolding-Roberts*, an adoption subsidy wasn't included in a parent's income, and the division concluded that the subsidy shouldn't be used to reduce a parent's child support obligation.  113 P.3d at 1267-68. The division explained that while the payments were made directly to the parent, the purpose of the subsidy was "to help, or remove financial barriers to, the adoption of Colorado children with special needs by providing assistance to the parent or parents in the payment of expenses of caring for and raising the child."  113 P.3d at 1267 (citation omitted).  The division observed — and we agree — that allowing the subsidy to be a credit against the father's child support obligation "would be tantamount to absolving father of his duty to support his child, placing [the child] in a worse position

than a child without special needs." *Id.* Similarly, in *Dunkle*, a division of this court concluded that adoption subsidies and foster care payments received by a parent were not income for that parent when determining child support. 194 P.3d at 465-66.

¶ 41 We are convinced that the same rationale applies to the difficulty of care payments from the HCBS-DD waiver. By including those payments in wife's income, the court diluted the intended effect of the difficulty of care payments — allowing L.L. to remain in her family's care and supplementing the costs of providing for L.L.'s increased needs. And including it as income would improperly dilute husband's responsibility to financially provide for L.L.

¶ 42 Indeed, other courts have warned that categorizing these payments as income could create a perverse incentive to institutionalize family members. *See Reilly*, 472 P.3d at 482 ("[F]amilies that strive to avoid institutionalization should be *encouraged, and not punished.*" (citation omitted)). Those needing twenty-four-hour care, like L.L., "are more likely to receive better continuous care from relatives living with them whose care is more than contractual." *Id.* (emphasis omitted) (citation omitted). Further, a family member providing such care will often "insure the

22

least intrusion upon the recipient's privacy." *Id.* at 483 (citation omitted). Allowing L.L. to receive her necessary care at home and from her own mother clearly improves the nature and quality of her care. Categorizing the difficulty of care payments as nonincome therefore encourages the positive outcomes sought by the HCBS-DD waiver.

¶ 43 Moreover, the negative outcomes associated with categorizing the difficulty of care payments as income contradicts the purposes of the HCBS-DD waiver and those of the Uniform Dissolution of Marriage Act (UDMA). For instance, our legislature has expressed a commitment to provide services for people with developmental disabilities that "minimize admissions to institutions." § 25.5-6-402(1)(a), C.R.S. 2025. Interpreting the income provisions of the UDMA in a way that provides an incentive to institutionalize family members with disabilities directly undercuts the legislature's stated policy goal. That incentive also offends the most basic policy goals of the UDMA, which include minimizing harm to the relationships between parents and their children and protecting children from the potential harm their parents' dissolution of marriage could cause

23

them.  *See* § 14-10-104.5, C.R.S. 2025; *In re Marriage of Bohn*, 8 P.3d 539, 542 (Colo. App. 2000).

¶ 44     Still, husband argues that because wife may spend the difficulty of care payments on expenses like household bills and living costs, the payments are income.  In support, he relies on *Tooker*, a case in which a division of this court ruled that to include benefits in a party's income, the funds must be available for the party's discretionary use or to reduce their daily living expenses. *Tooker*, ¶ 18.  Husband's argument misses the mark.  In *Tooker*, the division concluded that the husband's GI Bill tuition assistance wasn't income because the funds couldn't be used for his personal expenses.  *Id.* at ¶ 20.  But the *Tooker* division didn't hold that the mere availability of a portion of the financial benefit for discretionary use requires its inclusion in a party's income.  The maintenance and child support statutes likewise don't support husband's position.  *See, e.g.,* §§ 14-10-114(8)(c)(II)(B), 14-10-115(5)(a)(II)(B) (excluding from a party's income cash assistance paid out through the Colorado works program); § 26-2-706.6(2), C.R.S. 2025 ("[C]ash assistance" paid out through the Colorado

works program "is designed to meet the basic ongoing needs of the persons" receiving the payments.).

¶ 45 Accordingly, we conclude that the difficulty of care payments don't constitute income for the purposes of determining maintenance or child support.

c. The Difficulty of Care Payments Don't Reduce L.L.'s Needs

¶ 46 Finally, husband argues that even if we determine that the difficulty of care payments aren't income to wife, the payments should be considered as L.L.'s income because the benefits from these payments diminish L.L.'s basic needs. *See* § 14-10-115(11)(b) ("Any additional factors that actually diminish the basic needs of the child may be considered for deductions from the basic child support obligation."). We aren't persuaded.

¶ 47 In *Bolding-Roberts*, the division concluded that the trial court correctly declined to find that an adoption subsidy was income to the child. 113 P.3d at 1267-68. In that case, the subsidy paid benefits to parents who adopted children with "special, unusual, or significant physical or mental disability, or emotional disturbance." *Id.* at 1267 (citation omitted). The division reasoned that the adoption subsidy wasn't intended as a substitute or replacement for

lost income; instead, it was designed to offset the special needs of the adopted child. *Id.* at 1268. The subsidy therefore didn't reduce the child's needs for purposes of determining child support. *Id.* The division anchored its conclusion on the fact that, had the parents not separated, the child would have had the benefit of both parents' incomes *and* the subsidy. *Id.*

¶ 48    We agree with the logic of *Bolding-Roberts*. The difficulty of care payments don't reduce L.L.'s needs. Instead, they supplement the additional costs of caring for L.L. at home, partially offsetting those *increased* needs. Such payments therefore aren't income attributable to L.L. that would diminish her basic needs for purposes of determining child support.

¶ 49    In sum, because we determine that the difficulty of care payments aren't compensation and that categorizing them as income — for wife or for L.L. — contradicts the purposes of the UDMA and the HCBS-DD waiver, we conclude that the trial court erred by including these payments in wife's income when it determined spousal maintenance and child support. We reverse this portion of the trial court's permanent orders, and we remand the issues of maintenance and child support to the trial court for

reconsideration. Because orders on maintenance and child support are based on the parties' circumstances at the time the orders are entered, we direct the trial court on remand to consider the parties' circumstances at the time of the remand hearing. *See In re Marriage of Wright*, 2020 COA 11, ¶ 24; *In re Parental Responsibilities Concerning M.G.C.-G.*, 228 P.3d 271, 273 (Colo. App. 2010).

¶ 50 Wife further requests that we foreclose husband from arguing on remand that she is voluntarily underemployed or unemployed because the court declined to make any such finding in its original permanent orders. As discussed, the court must consider the parties' current circumstances at the time of entering orders on remand. Therefore, we decline wife's request.

### C. The Duration of the Maintenance Award

¶ 51 Wife also argues that the trial court erred by ordering the spousal maintenance to automatically terminate when husband retires. Because have reversed the maintenance award, and, on remand, the trial court must reconsider whether to award maintenance and what term, if any, is appropriate based on the parties' then-current circumstances, we don't need to reach this

27

issue. Additionally, given husband's testimony at the 2023 permanent orders hearing that he hoped to retire within two years, i.e., in 2025, it's unclear whether this issue will arise in the same posture on remand. We therefore decline to weigh in. *Cf. Nguyen v. Lai*, 2022 COA 141, ¶ 17 (noting our inability to give advisory opinions).

### III. Appellate Attorney Fees and Costs

¶ 52    Wife requests an award of her attorney fees incurred on appeal under section 14-10-119, C.R.S. 2025, due to the disparity in the parties' earning capacities and financial resources. *See In re Marriage of Collins*, 2023 COA 116M, ¶ 49 ("To ensure that a party does not suffer undue economic hardship from the proceedings in a dissolution of marriage case," section 14-10-119 permits the court to "order a party to pay a reasonable amount for the other party's attorney fees and costs based on the parties' relative economic circumstances."). The trial court is better positioned than an appellate court to consider the factual issues regarding the parties' current financial resources. Therefore, we direct the trial court to address wife's request for appellate attorney fees on remand. *See* C.A.R. 39.1; *Collins*, ¶ 86.

28

¶ 53    The trial court should also address the parties' requests for appellate costs under C.A.R. 39.  *See* C.A.R. 39(a)(4) ("[I]f a judgment is affirmed in part [and] reversed in part, . . . costs are taxed only as ordered by the trial court.").

## IV.  Disposition

¶ 54    We affirm the portion of the trial court's permanent orders that allocated husband's pension by using the deferred distribution method.  We reverse the portion of the orders concerning maintenance and child support.  The case is remanded to the trial court for further proceedings consistent with this opinion.

¶ 55    In particular, on remand, the court shall reconsider maintenance and child support based on the parties' circumstances at the time of the remand proceedings.  The court shall also incorporate into its judgment husband's stipulation concerning the full survivor benefit for wife on his pension.  And the court shall address wife's request for appellate attorney fees under section 14-10-119 and the parties' requests for appellate costs.

JUDGE KUHN and JUDGE SCHUTZ concur.